# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MARLYNX INVESTMENTS, LLC,**
a Michigan limited liability company,

Case: 2:07-cv-12296
Assigned To: Friedman, Bernard A
Referral Judge: Whalen, R. Steven
Filed: 05-29-2007 At 09:49 AM
CMP MARLYNX INV V PLASTICS RECOVERY
(RRH)

Plaintiff,

v

**COMPLAINT**

**PLASTICS RECOVERY SYSTEMS INTERNATIONAL, INCORPORATED**, a Michigan corporation, **RAYMOND V. MICHAEL, SUZANNE MICHAEL** and **STANLEY J. TARGOSZ, JR.**, jointly and severally,

Defendants.

_____/

Plaintiff says:

1. Plaintiff is a Michigan limited liability company, the resident office of which is located within the Eastern District of Michigan.

2. Defendant Plastics Recovery Systems International, Incorporated (PRSI), is a Michigan corporation, the resident office of which is located within the Eastern District of Michigan.

3. Defendants Raymond V. Michael and Suzanne Michael are husband and wife, both of whom reside within the Eastern District of Michigan.

4. Defendant Stanley J. Targosz, Jr. resides within the Eastern District of Michigan.

5. As set forth below, this is an action to recover damages for violations of the Securities Act of 1933, the Michigan Uniform Securities Act and for other pendant state court claims.

6.  Jurisdiction is conferred on this Court pursuant to 15 U.S.C § 77v (a), 28 USC § 1331 and 28 USC § 1367a.

7.  Venue is proper in this Court pursuant to 15 U.S.C. § 77v (a) and 28 U.S.C. § 1391 because the defendants are inhabitants of and transact business in this district, the subject offers and sales took place in this district and the matter arose entirely within this district.

8.  Defendants Raymond V. Michael and Targosz were the two incorporators of PRSI. At all relevant times Raymond V. Michael and Suzanne Michael held themselves out to plaintiff as being the two 50% "partners" of PRSI.  Defendant Raymond V. Michael is currently the treasurer and registered agent of PRSI.  At various times defendant Targosz asserted that he was a 50% "owner" of PRSI.

9.  At all relevant times, PRSI was controlled by the individual defendants, Raymond V. Michael, Suzanne Michael and Stanley J. Targosz, Jr.

10. PRSI is not now and has never been registered under any Federal or state law to act as an issuer, seller or broker for the sale of securities.

11. The individual defendants are not now and have never been registered under any Federal or state law to act as brokers, agents or sellers of securities.

12. On October 28, 2005, the individual defendants, acting as brokers, agents or sellers on behalf of PRSI, sold to plaintiff an investment contract, entitled "Promissory Note," in the amount of $100,000, with interest at the rate of 24% *per annum*.  A copy of the Promissory Note is attached at Tab 1.

13. On October 31, 2005, the individual defendants, acting as brokers, agents or sellers on behalf of PRSI, sold to plaintiff a second investment contract, entitled

"Promissory Note," in the amount of $100,000, with interest at the rate of 24% *per annum*. A copy of the Promissory Note is attached at Tab 2.

14. The promissory notes were offered and sold by means and instruments which included the use of interstate commerce, including the use of telephones, to make statements of material fact that were untrue and/or omitted to state material facts which were necessary in order to make the statements, under the circumstances in which they were made, not misleading, including but not limited to the following:

> a. Falsely representing to plaintiff that the promissory notes were sound investments, devoid of speculation;
>
> b. Falsely representing that the appropriate due diligence had been performed;
>
> c. Failing to advise plaintiff that the notes were, in fact, securities required to be registered under Federal or state law, which they were not; and
>
> d. As to defendant Raymond V. Michael, falsely representing to plaintiff that the subject of the scheme was a "very promising process."

15. To further facilitate their fraudulent and illegal scheme, defendants provided to plaintiff an "Executive Summary" and an untitled "prospectus" dated October 12, 2005. The "prospectus" contains numerous untrue statements of material fact and omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. The "Executive Summary" and the "prospectus" are attached at Tab 3.

16. Among the misrepresentations in the Executive Summary is the statement that defendant Raymond V. Michael owns and operates "one of the nations' largest wholesale energy businesses," a blatantly false representation relating to EnerCom Inc.,

which on information and belief is a Michigan corporation which shares offices with PRSI within the Eastern District of Michigan.

17. In fact, defendant Raymond V. Michael is presently subject to an Order to Cease and Desist issued April 17, 2006, by the State of Michigan, Department of Labor & Economic Growth, Office of Financial and Insurance Services, for the unlawful sale of unregistered securities in connection with an investment scheme for the factoring of energy related accounts receivables purportedly owned by EnerCom. A copy of the order is attached at Tab 4.

18. Plaintiff relied upon the untrue statements of material fact contained in the oral communications, in the Executive Summary and in the "prospectus."

19. The promissory notes were not registered as securities under any applicable Federal or state law and were not exempt from such registration.

## COUNT 1

20. Plaintiff incorporates all of the preceding paragraphs of this Complaint.

21. The promissory notes constitute "securities" within the definition of the Securities Act of 1933, in that the offer and sale of the promissory notes involved the investment of money in a common enterprise with the expectation of profits solely from the efforts of others.

22. The promissory notes were offered and sold in violation of sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c).

23. PRSI is liable to plaintiff pursuant to section 5(l) of the Securities Act of 1933, 15 U.S.C. § 77l.

24. The individual defendants are jointly and severally liable to plaintiff pursuant to section 5o of the Securities Act of 1933, 15 U.S.C. § 77o.

## COUNT 2

25.  Plaintiff incorporates all of the preceding paragraphs of this Complaint.

26.  The promissory notes constituted "securities" pursuant to section 401(z) of the Michigan Uniform Securities Act, M.C.L. 451.801(z).

27.  The securities were not registered.

28.  The securities were sold in violation of section 410(a)(2) of MUSA, M.C.L. 810.410(a)(2).

29.  The individual defendants were "agents" of the "issuer," PRSI, pursuant to sections 401(c) and 401(p) of MUSA, M.C.L. 451.801(c), (p), and were "controlling persons" pursuant to section 410(b) of MUSA, M.C.L. 451.810(b).

30.  Defendants are jointly and severally liable to plaintiff pursuant to section 410 of MUSA, M.C.L. 451.810.

## COUNT 3

31.  Plaintiff incorporates all of the preceding paragraphs of this Complaint.

32.  In connection with the offering and sale of the securities, the individual defendants, individually and in their capacity as agents of PRSI, knew or should have known that they were making untrue statements of material fact to plaintiff and were failing to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

33.  The misrepresentations, omissions and concealment of material facts to plaintiff by defendants were intentionally or recklessly made for the purpose of inducing plaintiff to purchase the securities.

34. Plaintiff reasonably and justifiably relied to its detriment on the truthfulness of defendants' representations and the completeness of their disclosures of material fact and was thereby damaged.

## COUNT 4

35. Plaintiff incorporates all of the preceding paragraphs of this Complaint.

36. Defendants had a duty to ensure that the information that they furnished to plaintiff was truthful, accurate and complete.

37. Defendants should have known, through the exercise of ordinary and reasonable care, that their statements to plaintiff were material and were false, misleading and incomplete.

38. Plaintiff reasonably and justifiably relied to its detriment on the truthfulness, accuracy and completeness of the statements made by defendants and was thereby damaged.

## COUNT 5

39. Plaintiff incorporates all of the preceding paragraphs of this Complaint.

40. The promissory notes constitute enforceable contracts.

41. PRSI is in default of both promissory notes.  No payment of principal or interest has ever been made to plaintiff on either note.

42. To the extent required, plaintiff has demanded payment of all amounts past due. In the event all amounts past due are not timely paid in full, the entire principal amount of each note together with interest has been accelerated.

**THEREFORE**, plaintiff requests:

A. Judgment in favor of plaintiff against defendants, jointly and severally, in whatever sum to which it is found to be entitled;

B. Interest at the rate of 24% *per annum* until entry of judgment; and

C. Judgment interest, costs and attorney fees.

Respectfully submitted,

STEPHEN M. LANDAU, P.C.
Stephen M. Landau    P16383
For Plaintiff
30100 Telegraph Road, Suite 428
Bingham Farms, MI 48025-4564
☎248.358.0870
sml@slandau.com
May 28, 2007



2 5

# PROMISSORY NOTE

## (FIXED RATE)

**$ 100,000.00**

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that BORROWER, PLASTIC RECOVERY SYSTEMS, INT'L., inc. hereinafter known as PRS, has received, and promises to pay in U.S. **$100,000.00**      this amount is called "principal"), plus interest, to the order of the Lender. The Lender is   Marlynx Investments.   PRS will make all payments under this Note in the form of cash, check, certified funds or money order at the option and direction of Lender, PRS understands that the Lender may transfer this Note.  The lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of principal has been paid.  PRS will pay interest at a yearly rate of 24%.  The interest rate required by this Section 2 is the rate PRS will pay both before and after, any default described in Section 6 (B) of this Note.

**3.    PAYMENTS**

(A)  Time and Place of Payments

PRS will pay principal and interest by making a payment every year.  PRS will make Annual payments on   October 28  of each year, beginning in 2006.  PRS will make these payments annually until PRS has paid all of the five annual interest payments.  Each annual payment will be applied as of its scheduled amounts under this Note. PRS will pay the remaining outstanding principal in full on that date, which is called the "maturity date".  PRS will make annual payments at 30800 Telegraph Rd., Suite 1850, Bingham Farms, MI 48025 or at a different place if required by the Note Holder.

(B)  Amount of Annual Payments

My annual payment will be in the amount of U.S. dollars payable at $  24,000.00 per year for the remainder of the note's term.

### 4.   PRS'S RIGHT TO PREPAY

PRS has the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment".  When PRS makes a prepayment, PRS will tell the Note Holder in writing that PRS is doing so.  PRS may not designate a payment as a prepayment if PRS has not made all the annual payments due under the Note.  PRS may make a full prepayment or partial prepayments without paying a prepayment charge.  The Note Holder will use any prepayments to reduce the amount of principal that PRS owes under this Note.  However, the Note Holder may apply any prepayment to the accrued and unpaid interest on the prepayment amount, before applying any prepayment to reduce the principal amount of this Note.  If PRS makes a partial prepayment, there will be no changes in the due date or in the amount of my annual payment, unless the Note Holder agrees in writing to those changes.

### 5.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted, so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me, which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal PRS owes under this Note or by making a direct payment to Note Holder.  If a refund reduces principal, the reduction will be treated as a partial prepayment.

### 6.   PRS'S FAILURE TO PAY AS REQUIRED

#### (A) Default

If PRS does not pay the full amount of each annual payment on the date it is due, PRS will be in default.

#### (B) Notice of Default

If PRS is in default, the Note Holder may send a written notice, that if PRS does not pay the overdue amount with 30 days, the Note Holder may require payment immediately of the full amount of unpaid principal and all interest owed on that amount.  That date must be at least 30 days after the date on which the notice is mailed or delivered by other means.

#### (C) Payment of Note Holder's Costs and Expenses

If the Note Holder has required immediate payment in full as described above, the Note Holder will have the right to be paid for all costs and expenses in enforcing this Note, to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorney's fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given under this Note will be given by delivering it or by mailing it by first class mail to the address above or other address used at that time.  Any notice that must be given to the Note holder under this Note will be given by delivering it by first class mail.


PLASTIC RECOVERY SYSTEMS, INT'L, INC.

By: _____          _____

     Its President, R. V. Michael                              Witness

Date: October 28, 2005



# PROMISSORY NOTE

## (FIXED RATE)

**$ 100,000.00**

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that BORROWER, PLASTIC RECOVERY SYSTEMS, INT'L., inc. hereinafter known as PRS, has received, and promises to pay in U.S. **$100,000.00**    this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  Marlynx  Investments.  PRS will make all payments under this Note in the form of cash, check, certified funds or money order at the option and direction of Lender, PRS understands that the Lender may transfer this Note. The lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  PRS will pay interest at a yearly rate of 24%.  The interest rate required by this Section 2 is the rate PRS will pay both before and after, any default described in Section 6 (B) of this Note.

### 3.    PAYMENTS

#### (A) Time and Place of Payments

PRS will pay principal and interest by making a payment every year.  PRS will make Annual payments on   October 31  of each year, beginning in 2006.  PRS will make these payments annually until PRS has paid all of the five annual interest payments.  Each annual payment will be applied as of its scheduled amounts under this Note.  PRS will pay the remaining outstanding principal in full on that date, which is called the "maturity date".  PRS will make annual payments at 30800 Telegraph Rd., Suite 1850, Bingham Farms, MI 48025 or at a different place if required by the Note Holder.

#### (B) Amount of Annual Payments

My annual payment will be in the amount of U.S. dollars payable at S  24,000.00 per year for the remainder of the note's term.

4.    PRS'S RIGHT TO PREPAY

PRS has the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment".  When PRS makes a prepayment, PRS will tell the Note Holder in writing that PRS is doing so.  PRS may not designate a payment as a prepayment if PRS has not made all the annual payments due under the Note.  PRS may make a full prepayment or partial prepayments without paying a prepayment charge.  The Note Holder will use any prepayments to reduce the amount of principal that PRS owes under this Note.  However, the Note Holder may apply any prepayment to the accrued and unpaid interest on the prepayment amount, before applying any prepayment to reduce the principal amount of this Note.  If PRS makes a partial prepayment, there will be no changes in the due date or in the amount of my annual payment, unless the Note Holder agrees in writing to those changes.

5.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted, so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me, which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal PRS owes under this Note or by making a direct payment to Note Holder.  If a refund reduces principal, the reduction will be treated as a partial prepayment.

6.    PRS'S FAILURE TO PAY AS REQUIRED

(A) Default

If PRS does not pay the full amount of each annual payment on the date it is due, PRS will be in default.

(B) Notice of Default

If PRS is in default, the Note Holder may send a written notice, that if PRS does not pay the overdue amount with 30 days, the Note Holder may require payment immediately of the full amount of unpaid principal and all interest owed on that amount.  That date must be at least 30 days after the date on which the notice is mailed or delivered by other means.

(C) Payment of Note Holder's Costs and Expenses

If the Note Holder has required immediate payment in full as described above, the Note Holder will have the right to be paid for all costs and expenses in enforcing this Note, to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorney's fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given under this Note will be given by delivering it or by mailing it by first class mail to the address above or other address used at that time. Any notice that must be given to the Note holder under this Note will be given by delivering it by first class mail.

PLASTIC RECOVERY SYSTEMS, INT'L., INC.

By: _____          _____
    Its President, R. V. Michael                                   Witness

Date: October 31, 2005



# Plastic Recovery Systems International, Inc.

## Executive Summary

### Project Description

We have a *patent pending process that strips paint off of plastic*. Our one of a kind plastic recovery system allows companies to recover their painted plastic waste as virgin material. Other plastic cleaning systems are not able to clean finished production parts as "Class A" and are not able to reprocess re-ground plastic without affecting the molecular makeup of the material.

Our process is completely non-hazardous and we have EPA documentation which allows us to dispose of any materials left after our process in normal waste facilities. We enable Part Suppliers to re-use their waste material (which presently cannot be re-used because of paint contamination on the plastic) and also eliminate the cost of any negative impact that these materials have on landfills, currently 1.5 million tons per year.

We are building service centers with production lines that will convert plastic waste into re-useable virgin material. Our experience and data collected from all of the major plastic suppliers indicates that we are the only processor that can provide this type of recovery.

We have been testing plastic cleaning since 1999 and in late 2002 developed the process that is "*Patent Pending*". Several Tier One companies have been testing our process and have concluded that we are able to provide them with material that will allow them to re-use the plastic as virgin material. The current amount of waste and subsequent savings to them is enormous. Not only will they save on purchasing virgin resins at a substantial savings, but the costs of handling, sorting, buffing, scuffing, repainting with same colors, inspecting, scheduling and expediting parts will be eliminated.

### Market Opportunity

The reprocessing of Plastic waste has a potential of 5 billion lbs. per year, just in the US Auto Industry, and the US Auto Market makes up only 20% of the world market.

The use of Plastics is not limited however to the Auto Industry. We will also be pursuing the Aerospace, Maritime, Furniture, Telecommunications, Electronic and Toy Industries. This will allow Plastic Recovery Systems International to rapidly expand throughout the USA and all of North America.

We currently have Letters of Intent for 34 million lbs. of plastic annually. These same corporations have an additional 200 + million lbs. of annual plastic waste available for cleaning. Every corporation that we have demonstrated our plastic cleaning process to have told us that, once a service center is in place in their region, they would be interested in taking advantage of our services. Each has stated they have an enormous part waste problem and that our system would save them a significant amount of time and money.

**Team:**

- **Stanley J. Targosz Jr.** professional experience includes many areas of manufacturing and sales. He has an MBA in Marketing and Finance and owns several businesses. He has been successful in developing sales, engineering new products and instituting manufacturing processes to complete products as well as help several auto parts suppliers implement their start up. Mr. Targosz is co-owner of the Patent Pending process for stripping paint off of plastics without using any hazardous materials or creating any hazardous wastes.
- **Marie V LePage** has a BA in Business Administration and a diverse background in finance and management. She has managed the finances and office operation for Sure-Weld and Semco Inc. for over 20 years. She also has an extensive background in managing real-estate and in managing projects within the musical industry.
- **Adam Targosz** has a BA in Business Administration. He complements this with a vast experience in tooling, manufacturing, engineering, design and human resource development.
- **Steve Long** has qualifications in several areas. He has owned a stamping and a manufacturing business. His expertise is in design and project builds with a great knowledge in the automation equipment industry. Mr. Long has had major experience as a process engineer and senior project manager.
- **Joseph C Eppich** background is in sales and marketing. He has a BA in Business Administration and has been Director of Sales and Marketing for several companies. Through his direction he was able to create a national sales organization for these companies.
- **Paul Montie** is the other co-owner of the Patent Pending process for stripping paint off of plastic. Mr. Montie has provided the intelligence to make this process successful. He has over 25 years experience as a paint process engineer with the Big Three and several Tier One OEM's. He has also been developing several processes that will impact the Plastic Industry in the future.
- **Ray Michael** has been a major business leader for over 40 years. He founded and built the world's largest executive search firm, and expanded several major franchises throughout the country. He owns and operates one of the nations' largest wholesale energy businesses. His knowledge and leadership is widely known within the industry.
- **Suzanne Michael** is presently CFO of Management Consultants International and has owned and operated a successful retail business. She manages the finance and office operations for all of Mr. Michael's companies. She is an equal partner in all corporations.
- **Mike Zeluff** has a BA from Michigan State University, and a J.D. from Cooley Law School. His background and expertise in corporate and organizational structuring for business start up operations is renowned for simplicity and cost efficiencies.
- **Dennis Holder** has extensive experience marketing in the wholesale plastics industry. His background in venture capital and start up companies provides the necessary skills for developing new ventures.
- **Glenn Marshall** has a BA in Business and comes from the automotive industry. His 30 years of manufacturing expertise with plastic waste streams and corporate supply chain management, is invaluable for new business activity.

**Financial Summary and Forecast**

Our initial facility has the capacity to process 25 million lbs. annually.  Typical substrates and coatings will be processed in larger Regional Service Centers that will be built in strategic locations nationally and internationally to service customer plastic waste requirements.  We project we will need to build approximately 171 production lines in regional service centers nationally to process the need in the US auto industry alone.  A conservative profit projection of $0.26 per pound makes our company's financial future impressive.  The costs for $5 million of venture capital are already factored into the $0.26 per pound.

**Sales & Marketing**

The marketing of our unique patented process has been put on "hold" for the foreseeable future.  At present we have commitments from several of the major, tier one automotive plastics suppliers giving us more potential business than we can handle for some time.  A few of these letters are included in the PowerPoint presentation under exhibits A, D, G, H and I.  We have approximately one hundred and fifty million pounds of product committed at present and once we begin full production I expect many if not all of the other suppliers will want our services.

The marketing that has been done so far has been done by the existing sales force of Semco Inc. (a subsidiary company of Stan Targosz).  In the future we expect to add a few more sales people to help service the costumers as well as any additional sales that might be needed.

**Funding Needs**

The research, testing and planning is finished.  Production lines in multiple service centers now need to be built.  PRSI is looking for venture capital to start building production lines in regional service centers across the nation.  We are shopping for the use of $5 million over 5 years from one or more sources.

Mark Vredeveld - PRSI. Inc.
888-884-0004

Plastic Recovery Systems International, Inc.

# Plastic Recovery Systems International, Inc.

10/12/2005

## Table of Contents

Process Description
Proven Methodology
Environmentally / Economically Friendly
Customer Demand
Automotive Market Potential
Worldwide Opportunities
Potential Markets
Teamwork and Knowledge
Expertise and Leadership
Frequently Asked Questions see page 17 thru 19
Marketing
Exhibits see page 20 thru 30

10/12/2005

# PROCESS DESCRIPTION

We have a *patent pending process that strips paint off of plastic.* Our one of a kind plastic recovery system allows companies to recover their painted plastic waste as virgin material. ( *Exhibit A* )

Other plastic cleaning systems are not able to clean finished production parts as "Class A" and are not able to reprocess re-ground plastic without affecting the molecular makeup of the material.

Our process is completely non-hazardous and we have EPA documentation which allows us to dispose of any materials residue from our process in normal waste facilities.

We are building service centers with production lines that will convert plastic waste into re-useable virgin material. Our experience and data collected from all of the major plastic suppliers indicates that we are the only processor that can provide this type of recovery. ( *Exhibit B & C* )

10/12/2005

# PROVEN METHODOLGY

We have been testing plastic cleaning since 1999 and in late 2002 developed the process that is *"Patent Pending"*. Several Tier One companies have been testing our process and have concluded that we are able to provide them with material that will allow them to re-use the plastic as virgin material. ( *Exhibit D* )

The current amount of waste and subsequent savings to them is enormous. Not only will they save on purchasing virgin resins at a substantial savings, but the costs of handling, sorting, buffing, scuffing, repainting with same colors, inspecting, scheduling and expediting parts will be eliminated.

Our initial facility has the capacity to process 25 million lbs. annually. Typical substrates and coatings will be processed in larger Regional Service Centers, that will be built, in strategic locations nationally, and internationally to service customer plastic waste requirements. ( *Exhibit E* )

10/12/2005

# ENVIRONMENTALLY / ECONOMICALLY

## FRIENDLY

Our process is completely non-hazardous and we have EPA documentation which allows us to dispose of any materials left after our process in normal waste facilities. We enable Part Suppliers to re-use their waste material (which presently cannot be re-used because of paint contamination on the plastic) and also eliminate the cost of any negative impact that these materials have on landfills, currently 1.5 million tons per year. ( *Exhibit F* )

We also know that within the next few years Auto Manufactures will have to disassemble and re-use material from old autos. The number of recycled autos will average 10 million per year with a plastic content of 3 billion lbs. This number will grow to 8 billion lbs per year based on the added plastic content and the increase of auto sales to 17.5 Million units per year.

10/12/2005

# CUSTOMER DEMAND

We currently have Letters of Intent for 34 million lbs. of plastic annually. These same corporations have an additional 200 + million lbs. of annual plastic waste available for cleaning. ( *Exhibit G* )

Every corporation that we have demonstrated our plastic cleaning process to has told us that once a service center is in place in their region, they would be interested in taking advantage of our services. Each has stated they have an enormous part waste problem and that our system would save them a significant amount of time and money. ( *Exhibit H & I* )

10/12/2005

# AUTOMOTIVE MARKET POTENTIAL

At today's rate there are 17 million vehicles made per year in the USA alone, with a plastic content of 300 lbs. per vehicle. Over the next 5 years the plastic content per vehicle is expected to increase to 450 lbs. per vehicle. $51 billion is being spent per year on new resin for the auto industry. This trend will only increase and enlarge our market for the foreseeable future.

( *Exhibit J* )

For new vehicles the scrap rate of new parts rejected before assembly averages near 15% or 1.6 Billion lbs. per year. With new resin prices ranging from $1.00 to $1.40 and the price of oil expected to increase even more, the need for our services will continue in high demand.

(*Exhibit K*)

10/12/2005

# WORLDWIDE OPPORTUNTIES

The reprocessing of Plastic waste has a potential of 5 billion lbs. per year, just in the US Auto Industry.  The US Auto Market makes up only 20% of the world market and will only decrease as a percentage as other Nations expand their presence, most notably China and India.  But without including their added potential, the World Plastic Scrap Market today reaches 10 to 15 billion lbs. per year creating enormous potential for our Plastic Recovery System.

10/12/2005

# POTENTIAL MARKETS

The use of Plastics is not limited however to the Auto Industry. We will also be pursuing the Aerospace, Maritime, Furniture, Telecommunications, Electronic and Toy Industries.   This will allow Plastic Recovery Systems International to rapidly expand throughout the USA and all of North America. We will also concurrently be developing organizations throughout the rest or the World. A key component to this expansion will be the experience of Management Consultants International Corp. as partners in bringing our project to fruition.

10/12/2005

# TEAMWORK and KNOWLEDGE

- Stanley J. Targosz Jr. professional experience includes many areas of manufacturing and sales. He has an MBA in Marketing and Finance and owns several businesses. He has been successful in developing sales, engineering new products and installing manufacturing processes to complete products as well as help several auto parts suppliers implement their start up. Mr. Targosz is co-owner of the Patent Pending process for stripping paint off of plastics without using any hazardous materials or creating any hazardous wastes.

- Marie V LePage has a BA in Business Administration and a diverse background in finance and management. She has managed the finances and office operation for Sure-Weld and Semco Inc. for over 20 years. She also has an extensive background in managing real-estate and in managing projects within the musical industry.

- Adam Targosz has a BA in Business Administration. He complements this with a vast experience in tooling, manufacturing, engineering, design and human resource development.

- Steve Long has qualifications in several areas. He has owned a stamping and a manufacturing business. His expertise is in design and project builds with a great knowledge in the automation equipment industry. Mr. Long has had major experience as a process engineer and senior project manager.

- Joseph C Eppich background is in sales and marketing. He has a BA in Business Administration and has been Director of Sales and Marketing for several companies. Through his direction he was able to create a national sales organization for these companies.

- Paul Montie is the other co-owner of the Patent Pending process for stripping paint off of plastic. Mr. Montie has provided the intelligence to make this process successful. He has over 25 years experience as a paint process engineer with the Big Three and several Tier One OEM's. He has also been developing several processes that will impact the Plastic industry in the future.

10/12/2005

# EXPERTISE and LEADERSHIP

- Ray Michael has been a major business leader for over 40 years.  He founded and built the world's largest executive search firm, and expanded several major franchises throughout the country.  He owns and operates one of the nations largest wholesale energy businesses.  His knowledge and leadership is widely known within the industry.

- Suzanne Michael is presently CFO of Management Consultants International and has owned and operated a successful retail business.  She manages the finance and office operations for all of Mr. Michael's companies.  She is an equal partner in all corporations.

- Mike Zeluff has a BA from Michigan State University, and a  J.D.from Cooley Law School.  His background and expertise in corporate and organizational structuring for business start up operations is renowned for simplicity and cost efficiencies.

- Dennis Holder has  extensive experience marketing in the wholesale plastics industry. His background in venture capital and start up companies provides the necessary skills for developing new ventures.

10/12/2005

# Frequently Asked Questions

Q.  What is this process ?

A.  Simply, it removes paint from plastics.

Q.  Why is there a demand for this service ?

A.  In the automotive industry and others, plastic is formed into shapes, painted, and packaged for distribution to customers.  During these processes the final product becomes damaged and suppliers cannot sell to the customer without repairs or rework.

Q.  What options does the manufacture have ?

A.  Presently, very few.  Suppliers can try to rework the damaged part or scrap it.  If scrapped, then there are added costs for transportation and landfill disposal.

Q.  What would YOUR company provide to remedy the suppliers scrap or repair problem ?

A.  The supplier would transport to your company painted plastic materials as regrind or damaged product.  Your company would remove the paint and return the plastic material to its virgin state for remelt or raw formed part for painting again.

10/12/2005

# Frequently Asked Questions (cont'd)

Q. What is the potential plastic scrap in just the automotive industry ?

A. Today, there is about 300 pounds of plastic components in each car/truck manufactured in the United States. Annual sales are around 17 million vehicles. This generates about 4.5 BILLION pounds per year. Based on industry scrap rates of around 18 to 21 percent, reprocessed plastics is about 900 million pounds annually.

Q. Of the 900 million pounds scrap annually, how much is painted ?

A. Approximately 76 percent of all plastics in automotive industry is either coated or painted. This generates nearly 684 million pounds of scarp plastics each year.

Q. With this much plastic scrap, are there other companies doing what your company would do ?

A. Very few, the problem is that their process requires harsh chemicals and slow processing time. This makes their process impractical, financially unfeasible, and it significantly impacts employee handling and environmental disposal.

Q. Are you concerned that other companies will copy your process ?

A. Absolutely not. We own the pending patent rights to the process and the developer is one of the owners of the company.

10/12/2005

13

# Frequently Asked Questions (cont'd)

Q. What is the capacity of each manufacturing line to clean the plastics ?

A. One line will clean about 5 million pounds per year or at 80 % of production, this will produce 4 million pounds annually.

Q. What is the cost per pound to clean the scrapped plastics ?

A. Cost is $ 26 cents per pound for all direct and indirect labor, also including material, office and administrative expense.

Q. How much can you charge for your finished product or cleaned plastics?

A. Current estimates per industry research and attached exhibits, we are confident of a $ 60 cents per pound market price.

Q. What is the profit potential per line ?

A. Based on 4 million pounds, and selling price of $ 60 cents/pound. and minus $ 26 cents production costs, each line will generate $ 1.44 million dollars per year

Q. How many lines will be required to service the North American auto market ?

A. Based on the 684 million pounds of scrap plastics to be reprocessed, a total of 161 production lines will be built over the next 5 years.

10/12/2005

# Marketing

The marketing of our unique patented process has been put on "hold" for the foreseeable future. At present we have commitments from several of the major, tier one automotive plastics suppliers. A few of these letters are included in the company summary under Exhibits A, B, C, D and E. We have approximately one hundred and fifty million pounds of product committed at present and once we begin production I expect many if not all of the other suppliers will want our services.

The marketing that has been done so far has been done by the existing sales force of Semco Inc. (a subsidiary company of Stan Targosz). In the future we expect to add a few more sales people to help service the costumers as well as any additional sales that might me needed.

10/12/2005

# *Exhibit A*

Stanley J. Targosz, Jr.
President, Semco, Inc.
21680 West Eight Mile Road
Southfield, Michigan  48075

7 June 2005

Letter of Support

Dear Sir,

We have been working with Semco to investigate the feasibility of recycling painted TPO back into new automotive components, by first completely removing the paint from rejected parts using your proprietary process. We understand that you are moving forward with your plans to construct a TPO recycling facility in your plant. When you are in operation, we would expect your price to be competitive with the marketplace for similar materials. At the moment, the market is getting of the order of $US 0.40 per pound for converting painted TPO into clean TPO pellets. Available processes are said to be capable of removing three complete layers of paint, i.e. completely removing paint from a part that has been painted three times. In the current petroleum-based market, prices for raw materials are fluctuating wildly, mostly upward. A reasonable estimate of conversion cost might be about 50% of the selling price of virgin TPO resin of the same type as that being recycled.  At present, we see a potential opportunity to recycle about 1,000,000 pounds of painted TPO annually, in several TPO grades.   Success in this area could naturally lead to further opportunities, as yet unqualified.

Yours truly,

Earlby Wakefield
Manager Materials Development
Decoma Product & Process Development
50 Casmir Court Concord, Ontario

10/12/2005

# *Exhibit B*

Semco Incorporated
21680 W. Eight Mile Rd.
South field, MI 48075

Joseph C. Eppich

Dear Joseph,

We have reviewed your project on the paint stripping operation and see a cost savings to Plastech. We have estimated our TPO re-grind to be in the 800,000 pound range per year. As you are well aware of we are presently building a facility in Ohio for doing the grinding up of our painted scrap TPO. We have been interested in your process since the day you called on me and mentioned that you were in the process of removing the paint off of TPO material. We understand that we would be responsible for delivering and picking up the material to the respective Plastech facilities.

Please keep me informed on the progress of the systems you are going to be building. Our facility for re-grinding should be up and running by the end of the first quarter of 2005.

We are looking forward to doing business with Semco. If you need anything further please do not hesitate to call. This addition to my original letter is in reference to your phone call of May 31, 2005 on an estimated price that Plastech would consider beneficial to saving on our re-grind TPO. My people have come back to me with an estimate of $0.37 per pound. I hope this assists you in your start up operation. We are looking forward to working with you.

Sincerely yours,

Allison M. Martinez
Corporate Operations Buyer
Cc: Todd Jones, Jack Cassills, Bill Szeleg

10/12/2005

# *Exhibit C*

10/12/2005

Sure Wald
12485 South Mason-M37
Grant Michigan, MI 49327
Attention:    Paul Muntie

As per our telephone conversation yesterday, this letter is to provide you the additional regulatory compliance information on our Product ___ is a mildly acidic water/solvent paint stripping compound containing non-hazardous solvents, surfactants, corrosion inhibitor and water. It does not contain the traditional stripping elements such as chlorinated solvent, phenol, nor caustics. It is not regulated by DOT when it is being shipped. The product itself is not regulated by EPA's RACA when it is being disposed.

The NFPA rating for this product is 2 for Health, 0 for Flammability, 0 for Reactivity, and none for the Special Hazard. The boiling point of the product is much higher that for pure water. The flash point is greater than 200F.

The product is an irritant classified by the OSHA regulations. The waste product can be disposed of as a non –hazardous waste. We trust that this information will satisfy your requirements. Please let us know if you need further assistance in this matter.

Very truly yours,

Michael Chang, Manager
Health and Environmental Department

# Exhibit D

October 05, 2005
Semco Inc.
24664 W. Eight Mile Rd.
Southfield, MI 49075

RE:   Letter of Intent to do Business

Attn: Mr. Joseph Eppich

Joe this letter is to be considered a formal letter of intent for our companies to potentially engage in a mutually beneficial relationship. Semco Inc. has a proprietary coatings removal system for the removal of certain coatings from plastic substrates. McDunnough has an extensive customer base, which it feels confident will purchase these plastic substrate materials, if the coatings were released.

McDunnough has the potential for sales of this material in the range of 20 to 30 million lbs per annum depending on pricing and capacity. These sales could be initiated immediately once your manufacturing line is operational and if your line can meet the volumes McDunnough requires at a price to be agreed upon later to meet these potential sales numbers. McDunnough has an extensive customer base that can utilize this technology, including but not limited to, the automotive market, which we believe could be the largest end user of these materials.

Please continue to keep us informed of your progress and timelines for anticipated startup of your production facility.

DISCLAIMER: Nothing in this letter of intent to do business shall be interpreted by the parties to constitute a binding contract between the parties.

Sincerely,
Kevin W. McDunnough
McDunnough, Inc.

10/12/2005

# *Exhibit E*

From:      <Ed_Cox@colaik.com>
Sent:      Friday, June 3, 2005 3:18 PM
To:        sintargosz@hotmail.com
Subject:   C&A Evart

Stan,

I appreciate the conversation today regarding Sure-Strip. We would be interested in exploring a future business relationship. Currently we have 40,000 lbs of regrind TPO per week that required stripping and regrinding. Target pricing is roughly 35cents / lb.

* We are also interested on-site stripping services.
** this is not a committal letter, but is simply a documentation of our interest in exploring opportunities with your Company.

Ed Cox
Collins & Aikman - Evart
Materials Superintendent
(231) 734-9002 phone
(231)734-9301 fax
Ed.Cox@Colaik.com

10/12/2005

20

# Exhibit F

TK HOLDINGS, INC.
2500 TAKATA DRIVE
AUBURN HILLS, MI 48326

SEMCO, INC.
21680 W. EIGHT MILE RD.
SOUTHFIELD, MI 48075
JOSEPH CARL EPPICH

DEAR JOSEPH,

WE ARE PLEASED TO INFORM YOU THAT TAKATA FEELS YOUR NEWLY PATENTED PROCESS OF STRIPPING PAINT OFF OF PLASTIC COULD BE BENEFICIAL TO TAKATA AT TWO OF OUR FACILITIES. WE HAVE ONE FACILITY IN SOUTH CAROLIANA THAT CREATES 10,000 POUNDS OF SCRAP TPO PER WEEK. OUR OTHER FACILITY IS IN MEXICO AND IT GENERATES 25,000 POUNDS OF SCRAP TPO PER WEEK. WE WOULD BE VERY INTERESTED IN YOUR PROCESS FOR THESE TWO PLANT'S INITIALLY.

PLEASE KEEP US INFORMED ON WHAT TIME FRAME YOU ARE CONSIDERING THAT CAN HANDLE THIS AMOUNT OF MATERIAL. ALSO, WE THINK THAT HAVING A SYSTEM ON SITE WOULD BE AN EXCELLENT IDEA. WE ARE LOOKING FORWARD TO WORKING WITH SEMCO TO THE MUTUAL BENEFIT OF BOTH OUR COMPANIES.

WILLIAM SIMPSON
SENIOR MATERIAL MANAGER

10/12/2005

Exhibit H

# *Exhibit I*

From October 11, 2004 Grain's International Newspaper for the Plastics Industry

*Materials Outlook*                    SPECIAL REPORT

## *The price of change. Ouch! Absorbing the resin effect*
By Frank Esposito plastics news staff

Resin prices launched them-selves into orbit around the plastics world in 2004, and resin makers expect those prices to stay aloft instead of coming back to earth.  Spurred on by stratospheric costs of crude oil and natural gas — and related products like ethylene, propylene and benzene — prices for most major commodity resins are up 20-40 percent to date in 2004. Even prices for normally predictable engineering resins are up at least 20 percent....

## Percent of price increase since January 2004





10/12/2005

# Exhibit J

Sunday, January 16, 2005  |  The Detroit News

**Companies raise prices 57 percent in 2004 due to high demand and costly raw materials such as oil**

*By Jack Kaskey*

General Motors Corp., Pepsi Bottling Group Inc. and Pactiv Corp. are seeing profits eroded by the surging cost of plastics that are used in everything from automobile bumpers to beverage bottles and trash bags.

The price of polyethylene, the world's most widely used plastic, surged 57 percent in 2004 and is the highest in more than a decade, boosting earnings for producers such as Midland-based Dow Chem-ical Co. and Nova Chemicals Corp.

Demand for plastic resins, a $51 billion business in the United States, grew 8.3 percent in the first 10 months of 2004, the American Plastics Council estimates. New cars contain about 280 pounds of plastic, double the amount in 1988. Chem-ical makers are raising prices as their raw material costs surge and as growing demand exhausts spare production capacity.

"In North America, we need at least three polyethylene plants per year announced and built, in order to keep up with demand growth," Nova Chief Executive Jeffrey Lipton said.

U.S. production of plastic resin in 2004 rose to 89 percent of industry capacity from 85 percent in 2003, the Arlington, Va.-based American Chemistry Council said. Capacity use will climb to 91 percent this year. A growing imbalance between supply and demand has been spurred in part by increased purchases by China, Lipton said. General Motors, the world's largest car maker, is trimming costs by using more recycled plastics under the hood, behind the instrument panel and inside the wheel wells of full size trucks, such as the Silverado.

"We are challenging our suppliers to find good solutions using recycled materials," said Tom Hill, a GM spokesman. U.S. automakers are using more plastic than a decade ago; replacing steel with light, easily shaped polymers in everything from door panels to bumpers, said Jim Kolb, vice president of automotive programs at the American Chemistry Council.

10/12/2005



*Exhibit K*



*Exhibit L*

# *Exhibit M*

Type of Substrates ...

| | |
|---|---|
| Capron | Polycarbonate |
| TPU | Hipp |
| GTX | Blended Nylons |
| PPE | Polypropylene |
| PVC | PPI/EHA |
| GTX 902 | PPO + PA |

| | |
|---|---|
| TPO | |
| Polypropylene | |
| PPO | |
| Polyethylene | |
| PA -r PPE | |

Type of Coatings...

1 & 2 component Urethane Polyester

| | | |
|---|---|---|
| Soft Touch | Soft Feel | Soft Suede |
| Enamel | Epoxy | Lacquer |
| Water Base | Water Borne | Rigid / Flex Clears |

10/12/2005



## STATE OF MICHIGAN
## DEPARTMENT OF LABOR & ECONOMIC GROWTH
## OFFICE OF FINANCIAL AND INSURANCE SERVICES

**Before the Commissioner of the Office of Financial and Insurance Services**

In the matter of:

**Management Consultants International, Inc.**          **Enforcement Case No.  06-4015**

**Raymond V. Michael**

**Matthews Consultants**

**J. Lamar Matthews**

   **Respondents**

_____/

*Issued and entered*
*on April 17, 2006*
*by Linda A. Watters*
*Commissioner*

## ORDER TO CEASE AND DESIST

The Office of Financial and Insurance Services of the Michigan Department of Labor and Economic Growth, pursuant to the Michigan Administrative Procedures Act of 1969, MCL 24.201 *et. seq.*, ("MAPA") and the Michigan Uniform Securities Act, as amended, MCL 451.501 *et. seq.*, ("Act"), and the rules promulgated under the Act, say that:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

   The staff of the Office of Financial and Insurance Services ("OFIS") alleges that the following facts are true and correct:

1. At all pertinent times, Management Consultants International, Inc., ("MCIC") was a corporation organized under the laws of the State of Michigan since 1998 (Corporate ID # 539071), and is located at 30800 Telegraph Road, Suite 1850, Bingham Farms, Michigan 48025.

2. MCIC is not a registered broker-dealer in the State of Michigan.